**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES,

    **Plaintiff**,

        **v.**

MIGUEL ÁNGEL AGOSTO-PACHECO
[1],

    **Defendant**.

**Criminal No.** 18-082 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court is defendant Miguel Ángel Agosto-Pacheco ("Agosto")'s motion to suppress communications obtained through a wiretap in Colombia. (Docket No. 154.) Agosto seeks suppression based on alleged violations of both the Fourth Amendment and Colombian law and desires an evidentiary hearing to resolve the motion. Id. at pp. 2 and 9. The United States opposes the motion. (Docket Nos. 190 and 209.)

    After referral of the matter to Magistrate Judge Bruce J. McGiverin, (Docket No. 158), the magistrate judge issued a Report and Recommendation ("R&R") recommending that the Court deny Agosto's motion, (Docket No. 225 at p. 1.) The magistrate judge did not hold an evidentiary hearing. See id. at pp. 1, 7-8.

Agosto objects to the R&R on substantive and evidentiary grounds.[1] (Docket No. 234 at pp. 1-2.) He also reiterates his request for an evidentiary hearing. Id.

As discussed below, the Court adopts the magistrate judge's recommendation for denial, albeit on a different footing. Agosto's motion to suppress, (Docket No. 154), is **DENIED**. His request for an evidentiary hearing is, consequently, also **DENIED**.

## I.   Background

### A.   Factual Background

In 2016, Colombian authorities were investigating a drug trafficking organization in Colombia. (Docket No. 190 at p. 2.) The organization was believed to be manufacturing and exporting cocaine from Colombia to the United States. Id. The Colombian authorities' investigation included wiretaps. Id.

In February 2017, Special Agent Héctor L. Cartagena ("Cartagena") of the United States Drug Enforcement Administration ("DEA") sent a letter to Colombian authorities asking them to initiate a wiretap on cellphone communications by a person known as "Junior." (Docket No. 190, Ex. 1 at p. 1.) Cartagena sent the letter after meeting with the Colombian authorities. See id. The letter pertained to an "investigation led by agents from [the

---

[1] Agosto styles his filing as a motion for reconsideration of the magistrate judge's R&R or, alternatively, as objections to the R&R. See Docket No. 234 at p. 1. The Court considers the filing as objections to the R&R.

Colombian authorities'] office." _Id._  In the letter, Cartagena

summarized information provided by DEA agents and put Junior's

cellphone information "at [the Colombian authorities']

disposition." _Id._  He also said,

> According to what has been stated and pursuant to the
> current international treaties between our
> countries, . . . I request you order the corresponding
> party to process the communications' interception of the
> related registered cellphones with the Prosecutor who is
> conducting the mentioned case, in order to acquire
> evidence for the legal procedure requested by my
> Government.

_Id._

On the same day, Colombian authorities submitted an

internal request to intercept Junior's communications.  (Docket

No. 207, Ex. 1.)  The request was "part of the mechanisms for

international cooperation and pursuant to the Official Request

issued by the [DEA]."  _Id._ at p. 1.  The request further noted

that Cartagena's letter "provide[d] the numbers of wireless/mobile

subscribers who are members of the Transnational Criminal

Organization in Colombia under investigation by the undersigned

[Colombian] investigators."  _Id._ at p. 2.  Additionally, the

request explained, "[t]his organization is under investigation by

the Judicial authorities of the City of Miami, Florida, and Puerto

Rico, United States," and "[f]or this reason, we request the

authorization . . . to perform all other tasks arising from said

Judicial Assistance, such as . . . interception of phones." _Id._ at p. 3.

The wiretap produced communications between Junior and others. (Docket No. 207, Ex. 5 at pp. 17–29.) Some communications involved Agosto. (Docket No. 190 at p. 3.)

A few months after the wiretap began, the Colombian authorities requested an extension of the wiretap. (Docket No. 207, Ex. 2.) In the extension request, they explained that "[t]he substantial grounds leading to the interception . . . arise from [Cartagena's letter]." _Id._ at p. 1. The extension request also discussed the information gathered to date without discussion of further involvement by Cartagena or other U.S. authorities. _Id._ The extension was granted on May 2, 2017. Docket No. 219, Ex. 1 at p. 1; _see also_ Docket No. 207, Ex. 7 at p. 7 (referencing "an extension order dated May 02, 2017"); Docket No. 207, Ex. 5 at p. 1 (referencing extension on May 2, 2017).

In June, the Colombian authorities then cancelled the wiretap on Junior. (Docket No. 207, Ex. 5 at p. 5.) Subsequently, Cartagena sent another letter requesting another wiretap on Junior. (Docket No. 207, Ex. 4 at p. 4.)

The Colombian authorities initiated the new wiretap, once again on the same date as Cartagena's letter. (Docket No. 207, Ex. 6.) The associated order "report[s] the information

gathered through international cooperation mechanisms with the [DEA]" by noting that information provided by the DEA "has given [the Colombian authorities] reason to continue the search for physical and material evidence . . . to be able to fight this criminal organization." Id. at p. 2. The order additionally notes that Colombian authorities were responsible for carrying out the second wiretap. Id. at p. 4.

An extension request for the new wiretap explains that information from the wiretap "has been distributed . . . following the bilateral judicial cooperation framework . . . which provide us with the information to coordinate with the United States Coast Guard in order to carry out the operations relevant to achieving the decommission of said speedboats." Docket No. 207, Ex. 9 at pp. 4-5. The wiretap was extended in November, id. at pp. 2, 34, and cancelled in January 2018, id. at 37.

B.    Procedural Background

In February 2018, Agosto was indicted on drug trafficking charges. (Docket No. 3 at pp. 1-2.) He was arrested and made an initial appearance later that month. (Docket No. 13.)

Agosto moves to suppress his communications intercepted through the wiretap. (Docket No. 154.) He argues that suppression is appropriate because the interceptions were unconstitutional pursuant to the Fourth Amendment to the United States Constitution

and because the interceptions violated Colombian law.  Id. at p. 2.
The Fourth Amendment applies to the wiretaps, Agosto contends,
because there was a joint venture between the authorities from the
United States and Colombia.  Id. at 4.  He seeks an evidentiary
hearing to resolve the motion.  Id. at p. 9.

        The United States opposes the suppression motion.
(Docket Nos. 190 and 209.)  The United States contends the Fourth
Amendment is inapplicable because there was no joint venture
between U.S. and Colombian authorities.  (Docket No. 190 at p. 6.)
The United States also says Colombian law was followed.  (Docket
No. 209 at p. 8.)  According to the United States, no evidentiary
hearing is required.  Id.

        This Court referred the matter to a magistrate judge.
(Docket No. 158.)  The magistrate judge declined to hold an
evidentiary hearing and recommended that the Court deny Agosto's
motion.  (Docket No. 225 at pp. 1, 7-8.)  According to the
magistrate judge, there was no joint venture between United States
and Colombian authorities, hence the Fourth Amendment does not
apply to the wiretap.  Id. at p. 6.  Additionally, the magistrate
judge concluded, the Colombian authorities did not violate
Colombian law in conducting the wiretaps.  Id. at 7-8.

        Agosto objects to the R&R.  (Docket No. 234.)  He
maintains that the Fourth Amendment does apply to the wiretap.

Id. at p. 1.  Agosto also contends that the magistrate judge erred in concluding that Colombian law was not violated because, according to Agosto, a Colombian document on which the magistrate judge relied is of questionable provenance and does not comply with Federal Rule of Evidence 902.  Id. at 1, 7–9.  He does not otherwise object to the magistrate judge's conclusions on Colombian law.  See id.  He restates his desire for an evidentiary hearing.  Id. at 9.

## II.  Standard of Review

A district court may refer a pending motion to a magistrate judge for a report and recommendation.  See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(a); Loc. Rule 72(b).  A party may file written objections to the magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); Loc. Rule 72(d).

A party that files a timely objection is entitled to "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  An issue not raised before the magistrate judge may be deemed waived by the district court.  Borden v. Sec. of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); see also Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990–91 (1st Cir. 1988) ("[A]n unsuccessful party is not

entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.").

In conducting its review, the district court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); see Loc. R. 72(d); Álamo-Rodríguez v. Pfizer Pharms., Inc., 286 F. Supp. 2d 144, 146 (D.P.R. 2003) (Domínguez, J.). "The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. See Templeman v. Chris Craft Corp., 770 F.2d 245, 247-48 (1st Cir. 1985); Hernández-Mejías v. Gen. Elec., 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (Fusté, J.).

As noted, Agosto objects to the magistrate judge's R&R regarding applicability of the Fourth Amendment, reliance on a Colombian document, and decision to forego an evidentiary hearing. (Docket No. 234 at pp. 1-2.) Accordingly, the Court conducts a *de novo* review of those aspects of the R&R. 28 U.S.C. § 636(b)(1).

## III. Discussion

### A. Fourth Amendment Applicability to Wiretap in Colombia

#### 1. Legal Standard for Applicability of Fourth Amendment to Searches by Foreign Authorities

The Fourth Amendment protects against unlawful searches and seizures. See U.S. Const. amend. IV. A wiretap is a search under the Fourth Amendment. See Berger v. New York, 388 U.S. 41, 63 (1967). Evidence obtained in violation of Fourth Amendment rights may be excluded from criminal trials. See Mapp v. Ohio, 367 U.S. 643, 648–49 (1961).

The exclusionary rule of the Fourth Amendment does not ordinarily apply to searches and seizures by foreign authorities in foreign jurisdictions. See United States v. Janis, 428 U.S. 433, 455 n.31 (1976); United States v. Valdivia, 680 F.3d 33, 51 (1st Cir. 2012). Evidence obtained by foreign authorities in foreign jurisdictions is generally admissible in United States courts even if acquired through a search or seizure that would not comply with United States law or the law of the foreign country. United States v. Stokes, 726 F.3d 880, 890 (7th Cir. 2013); United States v. Emmanuel, 565 F.3d 1324, 1330 (11th Cir. 2009); United States v. Mitro, 880 F.2d 1480, 1483 n.2 (1st Cir. 1989). This inapplicability of the exclusionary rule stems from the presumed lack of deterrence: "'[T]he actions of an American court are unlikely to influence the conduct of foreign police.'" Valdivia, 680 F.3d at 51 (quoting United States v. Hensel, 699 F.2d 18, 25 (1st Cir. 1983)); see Janis, 428 U.S. at 455 n.31.

One exception to the general inapplicability of the Fourth Amendment exclusionary rule to foreign authorities' searches occurs "where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts." <u>Valdivia</u>, 680 F.3d at 51–52. This exception is known as the joint venture doctrine. <u>Id.</u>

If the joint venture doctrine is satisfied, and thus the Fourth Amendment applies, courts determine whether the search was reasonable.[2] See <u>Stokes</u>, 726 F.3d at 893; <u>United States v. Barona</u>, 56 F.3d 1087, 1091 (9th Cir. 1995); <u>see also</u> <u>Hensel</u>, 699 F.2d at 25–26 (noting that warrantless search by foreign authorities could be considered unreasonable if it did not come within an exception to the warrant requirement). In this analysis,

---

[2] The First Circuit Court of Appeals suggested that, if the Fourth Amendment applies to a search because of the joint venture doctrine, the Fourth Amendment's warrant requirement may apply to the search. <u>Hensel</u>, 699 F.2d at 25–26 (examining whether exception to warrant requirement applied). A few years after <u>Hensel</u>, however, a majority of the United States Supreme Court said that a U.S. warrant "would be a dead letter outside the United States," <u>United States v. Verdugo-Urquídez</u>, 494 U.S. 259, 274 (1990), and three members of the Supreme Court, writing separately expressly stated that the Fourth Amendment's warrant requirement does not apply, in certain circumstances, outside the United States, <u>id.</u> at 278 (Kennedy, J., concurring); <u>id.</u> at 279 (Stevens, J., concurring in the judgment); <u>id.</u> at 297 (Blackmun, J., dissenting). After <u>Verdugo-Urquídez</u>, a number of courts have held that the Fourth Amendment's warrant requirement does not apply to searches by U.S. agents outside this country. <u>See, e.g.</u>, <u>Stokes</u>, 726 F.3d at 891–93; <u>In re Terrorist Bombings of U.S. Embassies in E. Afr.</u>, 552 F.3d 157, 167 (2d Cir. 2008). The Court need not address this issue further because Agosto does not argue that the wiretap evidence should be suppressed based on violations of the Fourth Amendment's warrant requirement. <u>See</u> Docket No. 154 at pp. 6, 10; <u>see also</u> <u>Paterson-Leitch</u>, 840 F.2d at 990–91 (concluding that a district court may refuse to entertain an issue not raised before the magistrate judge); <u>Borden</u>, 836 F.2d at 6 (noting that issues unraised before the magistrate judge may be deemed waived by the district court).

"the law of the foreign country must be consulted at the outset."

Barona, 56 F.3d at 1091 (quoting United States v. Peterson, 812

F.2d 486, 490 (9th Cir. 1987)). "If foreign law was not complied

with, 'the good faith exception to the exclusionary rule becomes

part of the analysis'" and courts ask "whether the United States

agents acted in good faith." Id. at 1091–93 & 1091 n.1 (quoting

Peterson, 812 F.2d at 492); see also United States v. Leon, 468

U.S. 897, 922 (1984) (creating the good faith exception).

          Ascertaining whether the joint venture doctrine is

satisfied presents a "factually based issue" that involves

"applying a legal label to a complex set of facts." Hensel, 699

F.2d at 25. Pursuant to the doctrine, courts examine the nature

and extent of cooperation among, and the activities of, United

States and foreign authorities.[3] See id. One court identified

the following four-factor test for evaluating the issue:

> (1) whether American authorities initiated the
> investigation in the foreign country; (2) whether
> American authorities were involved in the decision to
> seek the foreign wiretap; (3) whether American agents
> controlled, directed, or supervised the foreign wiretap;
> and (4) whether American agents participated in "the

---

[3] The circuit courts of appeal are not unanimous in how they test whether U.S. participation is to such an extent as to implicate the Fourth Amendment in a foreign search. United States v. Morrow, 537 F.2d 120, 140 (5th Cir. 1976). For instance, the Second Circuit Court of Appeals has declined to adopt the joint venture doctrine; instead, to find that U.S. cooperation with foreign officials implicates the Fourth Amendment in a foreign search, the court requires either U.S. control of foreign authorities or intentional constitutional evasion by U.S. authorities. United States v. Getto, 729 F.3d 221, 230–33 (2d Cir. 2013).

implementation of the wiretaps and recording of conversations."

United States v. Marte, Criminal No. 16-30044, 2018 WL 4571657, at

*6 (D. Mass. Sep. 24, 2018) (quoting Valdivia, 680 F.3d at 52).

Courts also look to the relative interest of the United States and

foreign governments in the matters under investigation.  Wayne R.

LaFave, 1 Search & Seizure § 1.8(h), at 456 (5th ed. 2012)

(hereinafter LaFave).

Some courts have found the facts before them to

satisfy the joint venture doctrine.  In Peterson, 812 F.2d at 490,

the court found a joint venture where United States authorities

characterized their actions as a "joint investigation" and were

"involved daily in translating and decoding intercepted

transmissions, as well as advising [foreign] authorities of their

relevance."  In Powell v. Zuckert, 366 F.2d 634, 639–40 (D.C. Cir.

1966), the court held that the Fourth Amendment applied to a search

by United States and Japanese officials where the only Japanese

interest served was compliance with a treaty obligation.

But the majority of cases find no joint venture.

United States v. Morrow, 537 F.2d 120, 140 (5th Cir. 1976); see

also LaFave, 1 Search & Seizure § 1.8(h), at 452 n.301 (collecting

cases).  For example, in Valdivia, 680 F.3d at 52, there was no

sufficient basis to find a joint venture where foreign authorities

initiated an investigation; a wiretap was not requested,

organized, or monitored by United States authorities; and United

States authorities only received recorded conversations after the

investigation concluded.  In United States v. Behety, 32 F.3d 503,

511 (11th Cir. 1994), the court found no joint venture where United

States authorities relayed information facilitating a search, were

present at the search, and videotaped part of it.  In United States

v. LaChapelle, 869 F.2d 488, 490 (9th Cir. 1989), testimony from

a Canadian official that there was no United States involvement in

initiating or controlling a wiretap was a sufficient basis on which

to defeat claims of a joint venture.

          Some cases present a close call which may be decided

by a finding that, even if there is a joint venture, the search

was not unreasonable.  For instance, in Hensel, 699 F.2d at 25,

the court noted that certain factors suggested a joint venture:

United  States  authorities  began  a  search,  asked  foreign

authorities to join, urged the foreign authorities to seize a ship

if it entered the foreign country's waters, showed firepower during

the  foreign  authorities'  boarding  of  the  ship,  provided

interpreters after the boarding, and participated in a second

search of the ship.  Countervailing factors included that foreign

authorities  controlled  the  search,  searched  for  evidence  of

violations of foreign law, intended to prosecute the defendant for

foreign crimes, performed the first search without United States

authorities, initially controlled all evidence, and were
potentially told by United States authorities to make boarding
decisions independently.  Id.  Probable cause for the search,
however, along with certain other considerations, meant that the
court did not need to decide whether a joint venture existed.  See
id. at 25–26.

Before proceeding to examine the instant facts in
the context of the joint venture doctrine, the nature of the
inquiry before the Court must be kept in mind.  Agosto objects to
both the magistrate judge's substantive conclusion on the joint
venture issue and the lack of an evidentiary hearing to develop
pertinent facts.  (Docket No. 234 at pp. 1-2, 6-7, 9.)  He asks
this Court to schedule a hearing.  Id. at 9.  Consequently, the
Court must review the standard applicable to a request for an
evidentiary hearing before turning to the facts.

## 2.   Legal Standard for Evidentiary Hearing

"A criminal defendant has no presumptive right to
an evidentiary hearing on a motion to suppress."  United States v.
Cintrón, 724 F.3d 32, 36 (1st Cir. 2013).  "[T]he decision of
whether to conduct an evidentiary hearing [on a motion to suppress]
is left to the sound discretion of the district court."  United
States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010).  To obtain an
evidentiary hearing, a defendant bears the burden of "'mak[ing] a

sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record.'" Cintrón, 724 F.3d at 36 (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)).

On materiality, the "most important[]" consideration is that, "'the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief.'" Id. (quoting Francois, 715 F.3d at 32). In a number of cases, the First Circuit Court of Appeals has held that a district court did not abuse its discretion in declining to grant an evidentiary hearing where even if a factual dispute were resolved in the defendant-movant's favor, the suppression motion would not have prevailed. See, e.g., United States v. Ponzo, 853 F.3d 558, 572–73 (1st Cir. 2017) (finding no disputed factual issues that undercut district court's independent source determination); Cintrón, 724 F.3d at 37 (finding that changes in some police officers' accounts were immaterial because one police officer's consistent testimony was undisputed); Francois, 715 F.3d at 32-33 (finding that disputed factual issue could not lead to conclusion that defendant was in custody for purposes of Miranda warning).

The court of appeals has also evaluated whether a sufficient threshold showing has been made in support of a motion

to suppress.  In the context of motions to suppress the fruits of
warrantless searches, defendants are required to "allege facts,
'sufficiently definite, specific, detailed, and nonconjectural, to
enable the court to conclude that a substantial claim is
presented.'"  United States v. Calderón, 77 F.3d 6, 9 (1st Cir.
1996) (quoting United States v. Lewis, 40 F.3d 1325, 1332 (1st
Cir. 1994)).  For instance, in Calderón, 77 F.3d at 9, the court
found no reason to disturb a district court's refusal to hold an
evidentiary hearing where a defendant offered no affidavits or
other evidence in support of his motion to suppress.  The
defendant's argument, the court explained, amounted to merely "a
supposition to which [the defendant] gave no flesh when he had the
opportunity on the motion to suppress."  Id.  By contrast, the
Calderón court pointed out, the prosecution offered police reports
which refuted the defendant's argument.  Id.  In another case,
Mitro, 880 F.2d at 1484, the court held that an evidentiary hearing
on suppression associated with the fruits of a foreign wiretap was
not required where defendants' challenge "consisted solely of
conclusory, general allegations" and defendants "failed to allege
any facts regarding specific acts on the part of the [foreign
authorities] that would even suggest circumstances" calling for
suppression.

### 3.   Application

The evidence in this paper record presents a close call on whether a joint venture existed between United States and the Colombian authorities.

On one hand, there are indications in the record that would support a finding of a joint venture. Cartagena requested the wiretap "in order to acquire evidence for the legal procedure requested by my Government." Docket No. 190, Ex. 1 at p. 1; see LaFave, 1 Search & Seizure § 1.8(h), at 456 (noting relevance of United States and foreign government's relative interest in the matter under investigation); cf. Valdivia, 680 F.3d at 52 (pointing to the fact that United States authorities did not request wiretap as weakening claim of joint venture). In their same-day internal request for the wiretap, the Colombian authorities pointed to a United States investigation, and explained that it is "[f]or this reason" they were requesting wiretap authorization. Docket No. 207, Ex. 1 at p. 3; see Powell, 366 F.2d at 639-40 (holding that the Fourth Amendment applies in a case where the only Japanese interest served was compliance with a treaty obligation); LaFave, 1 Search & Seizure § 1.8(h), at 456. Other Colombian documentation states "[t]he substantial grounds leading to the interception . . . arise from [Cartagena's letter]." Docket No. 207, Ex. 2 at p. 1; cf. Hensel, 699 F.2d

at 25 (noting that factors supporting a joint venture theory include that the United States authorities began a search and asked foreign authorities to join). Another Colombian document "report[s] the information gathered through international cooperation mechanisms with the [DEA]." Docket No. 207, Ex. 6 at p. 2; see Peterson, 812 F.2d at 490 (finding joint venture where United States authorities were "involved daily in translating and decoding intercepted transmissions, as well as advising [foreign] authorities of their relevance)".

On the other hand, the record also contains indications to the contrary. The Colombian authorities appear to have been investigating a related or identical drug trafficking organization before Cartagena's February 2017 letter. See Docket No. 190, Ex. 1 at p. 2; Docket No. 207, Ex. 1 p. 2; see also Valdivia, 680 F.3d at 52 (highlighting that foreign authorities had already initiated investigation before arrival of United States authorities as a reason for finding no joint venture). Cartagena's letter notes that it pertains to an investigation led by the Colombian authorities and was merely putting Junior's cellphone information at the Colombian authorities' disposition. Docket No. 190, Ex. 1 at p. 1; see Behety, 32 F.3d at 511 (finding that the district court properly found no joint venture where United States authorities relayed information facilitating a

search by foreign authorities).  After the wiretap began, none of

the  Colombian  documentation  discusses  any  United  States

involvement  in  the  wiretap  itself  beyond  passive  receipt  of  the

fruits  of  the  wiretap  and  the  potential  for  coordinated  action

based on those fruits.  See Docket No. 207, Ex. 2 at p. 1; Docket

No. 207, Ex. 9 at pp. 4–5; see also LaChapelle, 869 F.2d at 490

(finding  that  testimony  as  to  lack  of  United  States  authorities'

involvement in initiating or controlling a wiretap was a sufficient

basis  on  which  to  defeat  claims  of  a  joint  venture).  Indeed,

Colombian documentation states that the Colombian authorities were

responsible  for  carrying  out  the  second  wiretap,  see  Docket

No. 207, Ex. 6 at p. 4, and explains that the Colombians themselves

were interested in "fight[ing] this criminal organization," id. at

p. 2, and "attack[ing] the root of this criminal organization and

completely stop[ping] their criminal operations, Docket No. 207,

Ex. 9 at p. 5; see LaFave, 1 Search & Seizure § 1.8(h), at 456

(noting  relevance  of  United  States  and  foreign  government's

relative interest in the matter under investigation).

　　　　The  record  thus  reveals  factual  disputes  on

material issues based on facts that are "'sufficiently definite,

specific,  detailed,  and  nonconjectural,  to  enable  the  court  to

conclude that a substantial claim is presented.'"  Calderón, 77

F.3d at 9 (quoting Lewis, 40 F.3d at 1332).  For instance, there

is a dispute on whether, and the extent to which, United States
authorities initiated the investigation which led to Agosto.  Did
Cartagena's February 2017 letter begin that investigation, or did
the investigation pre-exist the letter?  If the latter, did the
meeting to which Cartagena's letter refers suggest prior
involvement by United States authorities with that investigation
as well?  Another disputed material fact concerns the Colombian
authorities' interest in the wiretaps.  At one point the Colombian
documentation notes that the reason for the wiretap is a United
States investigation, while at another point the documentation
explains that the wiretap is helping the Colombian authorities to
fight the drug traffickers.  And even though the record contains
limited support for the notion that United States authorities were
actively engaged in the wiretap itself, see, e.g., Docket No. 207,
Ex. 6 at p. 2 ("report[ing] the information gathered through
international cooperation mechanisms with the [DEA]), there is no
testimony or other evidence affirmatively stating that United
States authorities did not play such a role, cf. LaChapelle, 869
F.2d at 490 (finding testimony from foreign official as to lack of
United States involvement in initiating or controlling a wiretap
to be a sufficient basis on which to defeat claims of a joint
venture).

In light of these disputed material facts, Agosto has carried his burden to show a dispute on material fact ordinarily calling for a hearing on this issue. <u>Cintrón</u>, 724 F.3d at 36.

This case, however, does not require an evidentiary hearing or a finding on whether a joint venture existed between the United States and Colombian authorities. <u>See</u> <u>Cintrón</u>, 724 F.3d at 36; <u>Hensel</u>, 699 F.2d at 25. A determination against the government on the joint venture issue cannot change the ultimate result because, as discussed below, Agosto has not carried his burden to show a dispute of material fact on whether the wiretap was a reasonable search.[4]

**B.    Reasonableness of Search**

If the Fourth Amendment applies to the wiretap in Colombia, the question becomes whether the search was reasonable.

---

[4] The magistrate judge stated that "the lack of a joint venture is not necessarily determinative" because "Colombian law should have been followed for the evidence produced to be admitted." (Docket No. 225 at p. 6.) But evidence obtained by foreign authorities in foreign jurisdictions is generally admissible in United States courts even if acquired through a search or seizure that would not comply with the law of the foreign country. <u>Stokes</u>, 726 F.3d at 890; <u>Emmanuel</u>, 565 F.3d at 1330; <u>Mitro</u>, 880 F.2d at 1483 n.2. Consequently, the lack of a joint venture would be determinative, as foreign authorities' compliance with foreign law is generally not relevant to admissibility unless the Fourth Amendment applies. <u>Stokes</u>, 726 F.3d at 890; <u>Emmanuel</u>, 565 F.3d at 1330; <u>Mitro</u>, 880 F.2d at 1483 n.2; <u>see also</u> Docket No. 199 at p. 2 (conceding, in consent motion joined by Agosto and the United States, that the joint venture issue and the Colombian law issue are each independent and dispositive bases for denying Agosto's suppression motion). Nevertheless, because the Court agrees with the magistrate judge that Colombian law was not violated, the different footing adopted by the Court is immaterial to the result in this case.

See Stokes, 726 F.3d at 893; Barona, 56 F.3d at 1091; Hensel, 699 F.2d at 25-26. Answering that question requires the Court to first consider whether the foreign authorities complied with foreign law. Barona, 56 F.3d at 1091. The magistrate judge concluded that the Colombian authorities did not violate Colombian law. (Docket No. 225 at pp. 6-8.)

Agosto objects to only one aspect of the magistrate judge's conclusion on Colombian law, namely, the magistrate judge's reliance on a Colombian extension order produced to Agosto by the United States after briefing was completed on Agosto's motion to suppress. See Docket No. 234 at pp. 7-9 (Agosto's objection); Docket No. 219, Ex. 1 (Colombian extension order). "Most importantly," Agosto says, the extension order does not comply with Federal Rule of Evidence 902 because it is not accompanied by a certification of the genuineness of the signature and official position of the signer. See Docket No. 234 at p. 8. Additionally, according to Agosto, "it certainly should raise suspicions that such a crucial document was never provided to Defendant" until after briefing was complete. Id. In a reply brief, Agosto adds a concern that the extension order lacks indicia of reliability in light of Colombia's legal system where, according to Agosto, "'[t]he fear of prosecutorial indiscretion . . . is well founded.'" Docket No. 246 at p. 6 (quoting Luz E. Nagle,

Process Issues of Colombia's New Accusatory System, 14 Sw. J.L. & Trade Am. 223, 262 (2008)).  Agosto asks for an evidentiary hearing at which a witness familiar with the Colombian proceedings could attest to the integrity of the proceedings and explain the late production of the document.  (Docket No. 234 at p. 8.)

Agosto's authenticity and reliability arguments are unavailing.  Beyond speculation and conjecture, he does not explain why the United States' late production of the extension order casts doubt on the document's authenticity or reliability.  See Calderón, 77 F.3d at 9 (quoting Lewis, 40 F.3d at 1332) (requiring movant seeking an evidentiary hearing "to allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented'").

Moreover, after more than a month since the government produced the extension order, Agosto has not identified any issue with the actual extension order or the associated Colombian authorities.  Rather, he raises general concerns with Colombia's overall legal system, but such concerns do not help meet his burden under Calderón, 77 F.3d at 9.  See Mitro, 880 F.2d at 1484 (stating that evidentiary hearing on suppression associated with the fruits of a foreign wiretap was not required where defendants' challenge "consisted solely of conclusory, general allegations" and defendants "failed to allege any facts regarding specific acts on

the part of the [foreign authorities] that would even suggest circumstances" calling for suppression).

Meanwhile, other parts of the record—about which Agosto raises no authenticity issues—support the authenticity and reliability of the challenged extension order. <u>See</u> Docket No. 207, Ex. 7 at p. 7 (referencing "an extension order dated May 02, 2017"); Docket No. 207, Ex. 5 at p. 1 (referencing extension on May 2, 2017). Indeed, the record contains a Colombian court decision showing that, in the view of the Colombian judiciary, the wiretap at issue complied with Colombian law. <u>See</u> Docket No. 207, Ex. 7 at pp. 7–8.

Under these circumstances, Agosto has not shown that the extension order lacks sufficient indicia of reliability to be considered in deciding on a motion to suppress.[5] <u>United States v. Matlock</u>, 415 U.S. 164, 176–77 (1974); <u>United States v. Schaefer</u>, 87 F.3d 562, 570 (1st Cir. 1996). He has also failed to show that

---

[5] This case does not require the Court to find the extension order complies with the Federal Rules of Evidence, because those rules "do not apply at suppression hearings." <u>United States v. Schaefer</u>, 87 F.3d 562, 570 (1st Cir. 1996). Nonetheless, the circumstances in this case strongly suggest that the extension order would be self-authenticating under the Federal Rules of Evidence without the need for a certification. <u>See</u> Fed. Rule of Evid. 902(3) ("If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause . . . order that it be treated as presumptively authentic without final certification . . . ."); <u>United States v. De Jongh</u>, 937 F.2d 1, 5 (1st Cir. 1991) ("[W]e do not believe that the 'reasonable opportunity' and 'good cause' components of Rule 902(3) are scissile in all respects. Where the adversary, despite a fair chance to examine into the document's bona fides, casts no serious doubt on its authenticity, a finding of good cause can much more readily eventuate.").

there is a disputed issue of material fact requiring an evidentiary

hearing on the authenticity or reliability of the extension order.

Calderón, 77 F.3d at 9.

Having failed to impugn the reliability and authenticity

of the extension order, Agosto's suppression motion is doomed.

Agosto raises no other objection to the magistrate judge's finding

that Colombian law was not violated.  The Court can, and does,

consequently assume that Agosto agrees with all other aspects of

the magistrate judge's finding that Colombian law was not violated.

See Templeman, 770 F.2d at 247.  There are no disputed material

facts concerning Colombian law calling for a hearing, Calderón, 77

F.3d at 9, and Agosto is not entitled to a *de novo* review of

matters to which he does not object, see 28 U.S.C. § 636(b)(1).

The Court adopts the magistrate judge's finding that Colombian law

was not violated.  Id.

Indeed, besides his failed authenticity argument, Agosto

offers no reason why the wiretap could be considered unreasonable

under the Fourth Amendment.  Hence, even a favorable outcome to

Agosto on the joint venture issue would not entitle him to the

requested relief. Cintrón, 724 F.3d at 36; Hensel, 699 F.2d at 25–

26.

## IV.  CONCLUSION

For the reasons set forth above, the Court **ADOPTS** the magistrate judge's recommendation that Agosto's motion to suppress be denied, (Docket No. 225), albeit on a different footing, and **DENIES** Agosto's motion to suppress, (Docket No. 154.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 20, 2019.


s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE