**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>[1] MIGUEL ÁNGEL AGOSTO PACHECO,<br><br>Defendant. | CRIMINAL NO.: 18-82 (FAB) |

**REPORT & RECOMMENDATION**

## I. PROCEDURAL HISTORY

Pending before the court is a motion to suppress by Miguel Ángel Agosto Pacheco ("Defendant"). ECF No. 299. On February 8, 2018 a grand jury returned an indictment against Defendant charging him with Conspiracy to Possess With Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii), and with Conspiracy to Import a Controlled Substance in violation of 21 U.S.C. §§ 963, 952, 960(a)(1), and 960(b)(1)(B). ECF No. 3 at 1–2. Defendant filed the instant motion to suppress "identifications" of himself and two passengers made by officers of the Puerto Rico Police Department ("PRPD") during a traffic stop on July 27, 2017. ECF No. 299 at 4. The United States of America ("the Government") subsequently filed a response in opposition. ECF No. 324. On March 25, 2022 the court held an evidentiary hearing in which testimony and oral arguments from both parties were heard and documentary evidence submitted into the record. ECF Nos. 499, 500, 522.

## II.     FACTUAL BACKGROUND

On July 27, 2017 approximately ten law enforcement officers of a joint Task Force with the U.S. Drug Enforcement Administration ("DEA") were conducting a surveillance operation of the Luis Muñoz Marín Airport in Carolina, Puerto Rico. ECF No. 531 at 20; 22. ¶¶ 19–21. PRPD Officer Orlando Feliciano ("Officer Feliciano") was a member of the Task Force and testified at the suppression hearing. ECF No. 531 at 18, ¶¶ 9–15. Officer Feliciano explained that the objective of the surveillance at the airport on July 27, 2017 was to identify a suspected drug trafficker arriving at the airport to pick up two passengers from Colombia. ECF No. 531 at 21, ¶¶ 1–6. Officer Feliciano and fellow PRPD Officer Leslie Rivera ("Officer Rivera") were ordered to follow the individual's vehicle from the airport and effectuate a traffic stop to ascertain the identities of the driver and his passengers. ECF No. 531 at 21, ¶¶ 18–25. On that day, Officer Feliciano was uniformed and drove a marked PRPD patrol car while Officer Rivera sat in the front passenger seat. ECF No. 531 at 22, ¶¶ 1–13.

At approximately 2:00 to 3:00 PM on July 27, 2017, other members of the Task Force conducting surveillance at the airport notified Officers Feliciano and Rivera via radio that the person of interest had arrived to pick up the Colombian passengers. ECF No. 531 at 23, ¶¶ 1–6. The Task Force officers informed Officers Feliciano and Rivera that the individual had arrived in a black Mercedes Benz. ECF No. 531 at 23, ¶¶ 7–11. At the hearing, Officer Feliciano identified the Defendant as the individual who arrived at the airport and who was the target of the surveillance on that day. ECF No. 531 at 19, ¶¶ 19–25; 20, ¶¶ 1–3. At the pickup, one of Defendant's passengers sat in the front passenger seat and the other sat in the back seat. Officers Feliciano and Rivera spotted Defendant's black Mercedes Benz as it left the airport and they followed Defendant's vehicle for about 2 to 3 minutes as it traveled down Baldorioty Avenue

toward Carolina, Puerto Rico. ECF No. 531 at 23, ¶¶ 12–23. The PRPD officers trailed Defendant's car from behind at a distance of "seven or eight vehicles." ECF No. 531 at 24, ¶¶ 17–20. Officer Feliciano testified that as they followed Defendant's automobile, they were "trying to find a violation of the law." ECF No. 531 at 24, ¶¶ 1–2.

After tailing Defendant for seven (7) to nine (9) minutes on Baldorioty Avenue, Defendant's black Mercedes Benz exited onto a street in Carolina, Puerto Rico. ECF No. 531 at 24, ¶¶ 11–16. As they drove down the street in Carolina, Officer Feliciano brought the patrol car closer and roughly abreast but slightly behind Defendant's automobile. ECF No. 531 at 24, ¶¶ 21–25; 30, ¶¶ 21–25; 31, ¶¶ 1–4. Officer Feliciano testified that he and Officer Rivera then performed a traffic stop of Defendant's car because both he and Officer Rivera saw that the rear passenger was not wearing a seat belt. Upon executing the traffic stop, Officer Feliciano explained that he and Officer Rivera exited their patrol car and approached Defendant's vehicle from behind. When Officer Feliciano arrived at the Mercedes Benz, he observed that the rear passenger was in fact wearing her seat belt "at that time." ECF No. 531 at 32. Officer Feliciano described how in his experience, when someone is stopped for a traffic violation and are not wearing their seat belt, they usually put it on so that they are wearing it when interacting with police. ECF No. 531 at 33–34.

Officer Feliciano informed Defendant that he stopped the car because the Defendant's rear passenger was not wearing her seat belt, and asked Defendant for his driver's license and vehicle registration. ECF No. 531 at 34. Officer Feliciano allowed Defendant to exit the vehicle, open the trunk of the car, and retrieve his driver's license from a fanny pack. Approximately three (3) minutes passed between the time Officer Feliciano stopped Defendant's car and when he examined Defendant's driver's license. ECF No. 531 at 36. After looking at Defendant's

3

driver's license, Officer Feliciano requested "the identification of the passengers to verify that they were legally here in Puerto Rico." ECF No. 531 at 36. Officer Feliciano then took all three identification documents to his patrol car where he photographed them. The documents consisted of Defendant's driver's license and two passports from the Republic of Colombia. ECF Nos. 531 at 36–37; 500-1; 500-2; 500-3. Officer Feliciano explained that he then returned the identification documents to Defendant and his passengers and they were given permission to leave. According to Officer Feliciano, the entire stop lasted approximately eight (8) minutes. ECF No. 531 at 37.

### III. LEGAL ANALYSIS

The Supreme Court conceives of a traffic stop as akin to a brief detention authorized by *Terry v. Ohio*. *United States v. Fernández*, 600 F.3d 56, 59 (1st Cir. 2010) (citing *Berkemer v. McCarty,* 468 U.S. 420, 439 n. 29 (1984); *Terry v. Ohio,* 392 U.S. 1, 88 (1968)). When making a traffic stop of a vehicle, the police have made a seizure of everyone inside the vehicle—both driver and passengers. *Brendlin v. California,* 551 U.S. 249, 255 (2007). Violation of a defendant's Fourth amendment rights is remedied by the suppression of evidence obtained through the illegal police conduct, including evidence found as a direct result of the illegal conduct as "fruit of the poisonous tree." *United States v. Kimball,* 25 F.3d 1, 5 (1st Cir. 1994). However, in moving to suppress evidence, the defendant "bears the burden to show a Fourth Amendment violation." *United States v. Young¸* 835 F.3d 13, 19 (1st Cir. 2016).

#### A. Whether the Defendant has Standing to Suppress the Identities of His Passengers

Defendant not only moves to suppress his own identity produced as a result of his stop by the PRPD officers, but also moves to suppress the identities of his passengers. ECF No. 329 at 4. Defendant argues that there was no probable cause to stop the vehicle and that Officer Feliciano

4

unjustifiably extended the length of the traffic stop to request the identification of the Defendant's passengers. ECF No. 299 at 3–4. Each individual subject to a police seizure "may challenge his own detention regardless of whether he was the immediate target of the investigation or whether he had a privacy interest in the vehicle itself." *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998). Even so, a Defendant moving to suppress evidence must "prove that the challenged governmental action infringed upon his *own* Fourth Amendment rights." *Kimball,* 25 F.3d at 5 (emphasis added). This is because, "Fourth Amendment rights are personal," and therefore "cannot be vicariously asserted." *Rakas v. Illinois,* 439 U.S. 128, 133 (1978). As such, while a defendant has standing to challenge his to his own seizure, he cannot raise a constitutional Fourth Amendment claim based on the alleged violation of a third person's privacy rights—such as those of a passenger inside his vehicle. *Sowers*, 136 F.3d at 27.

Showing a violation of defendant's own "expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis." *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir.1994). "The Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy." *Id*. The defendant bears the burden of persuasion to show that he possessed a subjective expectation of privacy which was violated by the police, and that his expectation of privacy was subjectively reasonable under the circumstances. *Id.*; *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988). A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to claim an illegal search or seizure. *Lewis*, 40 F.3d at 1333.

Courts from various circuits have opined that a defendant does not have a valid privacy interest in someone else's person, even if that person is a passenger in the defendant's vehicle.

*Sowers*, 136 F.3d at 28–29 (concluding that Defendant had no Fourth Amendment standing to challenge the pat-down search of the passenger in his vehicle); *United States v. McCray*, 230 F. Supp. 2d 89, 93 (D. Me. 2002) (finding that the driver had no reasonable expectation of privacy in the coat that one of his passengers was wearing); *United States v. Miles*, 2006 WL 2403464, *3 (W.D.N.Y. 2006) ("Regardless of the legality of the seizure of the occupants of the Lincoln Navigator automobile, none of the defendants in the instant case can demonstrate the requisite expectation of privacy in the place where the drugs were concealed, to wit, within the person of the female passenger.").

  Even if inspecting the passengers' identification documents infringes on some privacy right held by the passengers, Defendant does not have standing to raise a Fourth Amendment claim on their behalf. Furthermore, no evidence was produced at the hearing which would explain how or why the Defendant had any close connection to the passenger's passports to create for himself a privacy interest in their passports. The Colombian passengers' passports were their property and only contained information about the individual passengers. Defendant's privacy was not violated when police looked at those documents. Courts have clearly held that Defendant has no privacy interest in a search of his passengers' persons and asking for a passenger's identification is much less intrusive than a physical search of the passenger's person. Defendant fails to show how lacking a privacy interest in his passengers' persons he now has some higher privacy interest in his passengers' identities.

  Defendant nevertheless urges that he has standing to suppress his passenger's identities because he "is seeking to vindicate his own Fourth [A]mendment rights" because the identities of his passengers were only discovered as a result of the allegedly illegal stop, and therefore, the identities "could become evidence in the case against [Defendant], just like the finding of illegal

contraband or an illegal weapon could have been." ECF No. 329 at 3–4. However, Defendant's argument is clearly foreclosed here. Merely because a defendant would be prejudiced "through the use of evidence gathered as a consequence of a search or seizure directed at someone else" does not give the defendant standing. *Rakas,* 439 U.S. at 135. Indeed, if a defendant's only interest is to suppress evidence which might be used against him at trial, that interest is not protected by the Fourth Amendment. *United States v. Lewis,* 40 F.3d 1325, 1334 (1st Cir. 1994) (the defendants' "only interest in suppressing the contraband appears to be to avoid its evidentiary force against them; this is not an interest protected by the Fourth Amendment."). Therefore, Defendant also has no standing to assert the Fourth Amendment rights of his passengers to suppress their identities as "fruit of the poisonous tree," even if their subsequently discovered identities would be used as evidence against him.

In sum, Defendant is free to challenge the legality of his own detention when he was pulled over by Officers Feliciano and Rivera, but he cannot assert the Fourth Amendment rights of the two passengers inside his vehicle. Accordingly, Defendant has no standing to suppress their identities, and his motion to suppress with regard to any evidence of his passengers' identities should be denied.

### B. Whether the Initial Stop Was Lawful

Defendant also moves to suppress his own identification because Officer Feliciano's stop of Defendant's vehicle was unlawful. ECF No. 299 at 3–4. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances." *Id*. at 810. The reasonableness of the stop does not depend upon the

subjective intentions of the police officers who executed the stop, and "the fact that a traffic violation operates as a pretext for stopping motorists about whom the police harbor unrelated suspicions plays no role in the constitutional analysis." *United States v. Mendonca*, 682 F. Supp. 2d 98, 103 (D. Mass. 2010) (citing *Whren*, 517 U.S. at 813). Even so, "the decision to stop an automobile is reasonable where the police actually have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 ("[T]he District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the [pretextual] stop reasonable under the Fourth Amendment . . . .").

In this case, Officer Feliciano acknowledged that the stop of Defendant's vehicle was pretextual because on July 17, 2017 police suspected Defendant of involvement in drug trafficking, and Officers Feliciano testified that he and Officer Rivera followed Defendant's vehicle "trying to find a violation of the law." ECF No. 531 at 24, ¶¶ 1–2. The Government argues that the stop was nevertheless supported by probable cause because Officer Feliciano testified that he he saw that one of Defendant's passengers was not wearing a seatbelt. ECF No. 324 at 7–8. For the following reasons, the court finds that Officer Feliciano's testimony was not credible so as to support a finding of probable cause for the traffic stop.

Officer Feliciano testified at the hearing that as he brought the patrol car next to Defendant's Mercedes Benz, he could see into Defendant's passenger compartment and observed that there were three persons inside: Defendant who was driving the vehicle, a passenger in the front seat, and a third person who "was sitting right behind the front passenger but she was leaning into right between the driver's seat and the front passenger." ECF No. 531 at 25. He testified that Officer Rivera told him that the passenger in the back seat was not wearing her seat belt. ECF No. 531 at 29. Officer Feliciano claims that upon being told that, he looked into the

back seat of Defendant's vehicle "to corroborate what she [Officer Rivera] was telling me." ECF No. 531 at 29. Officer Feliciano asserts that he could see "the back passenger leaning into the front in between the two front seats without using the seat belt" and accordingly executed the traffic stop of Defendant's vehicle for this traffic violation. ECF No. 531 at 29. As explained below, under the totality of the evidence, Officer Feliciano's testimony is not credible when he asserts that while driving, he could make out that the rear passenger was not wearing a seatbelt.

First, the circumstances surrounding Officer Feliciano's testimony cast serious doubt on his assertion that he was able to see that the rear passenger was not wearing her seatbelt. On cross examination, Officer Feliciano estimated that at the moment he allegedly observed the passenger's seatbelt infraction, he was driving his patrol car next to Defendant's vehicle at "[c]loser to thirty miles per hour" on the roadway. ECF No. 531 at 46. He also testified on cross examination that in order to see the traffic infraction he had to lean forward in order to avoid Officer Rivera from obstructing his view as she sat in the passenger seat of the patrol car. ECF No. 531 at 47. In addition, Officer Feliciano's line of sight was partially obstructed by the front pillar of the patrol car which sits between the windshield and the right-side passenger windows. ECF No. 531 at 47.[1] Finally, Officer Feliciano testified that when he executed the stop of Defendant's vehicle and spoke with the Defendant and his passengers, the woman in the back passenger seat was indeed wearing her seatbelt. ECF No. 531 at 32. While she might have been able to slip it on without Officer Feliciano seeing her, there is no direct evidence that anybody saw her doing so.

---

[1] From her position in the front passenger seat, Officer Rivera would have had a less-obstructed view of the rear passenger compartment of Defendant's vehicle, although the window tint would have also obscured her view. She was also not concentrated on driving, and so may have been able to focus more on the back seat passenger. Officer Rivera, however, did not testify at the hearing. Furthermore, the video evidence admitted at the hearing convincingly demonstrates that the tint of the window would have obstructed a clear view by either PRPD Officer as to whether the passenger was in fact wearing a seat belt.

9

Secondly, the windows of the Mercedes Benz were tinted which would have also contributed to obstruct Officer Feliciano's view. Officer Feliciano acknowledged on cross examination that the rear windows of Defendant's Mercedes Benz were tinted but nevertheless asserted that the tinting was "not that dark that you couldn't see inside the vehicle." ECF No. 531 at 43; 44, ¶¶ 1–6. The government contends that this testimony combined with video evidence introduced by Defendant shows that Officer Feliciano would have been able to see whether the rear passenger was wearing a seatbelt. ECF No. 537 at 4. The Government draws the court's attention to second markers 0:15 through 0:25 of the video taken of Defendant's vehicle on July 27, 2017 and marked as Exhibit A. ECF No. 537 at 4–5. At that point in the video, an airport attendant and one of car's passengers opens the door of Defendant's black Mercedes Benz, and the tinted glass of the car's window is very transparent, if not slightly shaded. Exhibit A, Secs. 0:15–0:25. The Government argues that this evidence shows that the "windows appear almost completely clear" and as such, when Officer Feliciano drove abreast of Defendant's moving vehicle, he likewise would have been able to see inside the vehicle. ECF No. 537 at 4–5. At the very least, the Government contends, "it would still be possible to see the back passenger leaning so closely toward the console that she could not be wearing her seat belt." ECF No. 537 at 5.

However, a single pane of tinted glass mounted on a car door, backlit by its outdoor surroundings is much less opaque than a tinted glass window on a car door that is closed. While the door is closed, the glass is not backlit, and the dim interior of the car exacerbates the opaqueness of the tinted glass, particularly if all the rear windows of the vehicle are also tinted. Hence, scrutinizing the tinted glass while the door was open at the airport does not provide a realistic representation of the window's true opacity, particularly because when Officer Feliciano allegedly made his observations the doors and windows of Defendant's vehicle were closed. A

more accurate representation of the window's transparency with the door closed can be observed at second markers 44 through 47 of Exhibit A. Exhibit A, Secs. 0:44–0:47. Officer Feliciano testified on cross examination that second marker 0:45 approximates the vantage point he had (albeit from the opposite side of the vehicle) when he allegedly could see into the back seat of Defendant's vehicle. ECF No. 531 at 61. At second marker 0:45 the Mercedes Benz is in motion with the rear doors closed and the front windows rolled down. Exhibit A, Secs. 0:45. From this angle, and with the doors closed, the rear window glass is extremely opaque, and vague forms can be perceived only slightly through the glass. Exhibit A, Secs. 0:45.

Accordingly, the court finds that it is possible that the tinted window of Defendant's car permitted Officer Feliciano to see the shape of the passenger in the back seat and, under the right lighting conditions, he may even have been able to see that she was leaning forward. But even assuming that Officer Feliciano could make out the rear passenger's shape, many seatbelts in the rear passenger seats of a car do not restrict all movement, and a passenger, even when properly "buckled up" can still lean forward, positioning their body at least partially between the front seats. As such, a mere observation that a passenger is leaning forward from the back seat does not necessarily indicate that a passenger is not wearing a seatbelt. The video does show, however, that the degree of tinting in the windows when the doors of the car were closed would not have permitted Officer Feliciano to distinguish the presence or absence of a seatbelt strap, which would be nearly impossible to see through the tinted glass of Defendant's car window.

The totality of the circumstances showing that (1) Officer Feliciano was trying to drive the patrol car and observe at the same time, (2) his view was substantially obstructed, (3) the dark-tinted glass of Defendant's rear passenger windows concealed all but vague shapes inside the vehicle, and (4) the fact that the rear passenger was wearing her seatbelt when stopped, leads

11

the court to conclude that Officer Feliciano's testimony is not credible when he claims he could see that the rear passenger was not wearing a seatbelt. Instead, the court finds that in the heat of searching for a pretext to stop Defendant, Officer Rivera communicated to Officer Feliciano that the rear passenger was not wearing a seat belt and Officer Feliciano reacted by pulling over the Defendant's vehicle simply because he saw the shape of the back passenger leaning forward. In sum, based on the evidence presented at the evidentiary hearing, probable cause did not exist that Defendant's vehicle had committed a traffic infraction. Thus, it is the inevitable conclusion that the PRPD Officers' stop of Defendant's vehicle was unlawful.[2]

### A.  Whether Defendant Can Move to Suppress His Own Identity

Defendant has standing to challenge the violation of his own Fourth Amendment rights following the unlawful traffic stop executed by Officers Feliciano and Rivera. Nevertheless, the Government argues that Officer Feliciano's request for Defendant's identification does not implicate the Fourth Amendment. ECF No. 324 at 9. In support of its argument, the Government cites Supreme Court precedent which held that when a police officer makes a legitimate stop, he is free to ask for identification without having conducted a Fourth Amendment search or seizure. *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County,* 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."). However, in this case, by the time Officer Feliciano asked for Defendant's identification, a Fourth Amendment seizure had already occurred in the form of a traffic stop. *Brendlin*, 551 U.S. at 255 ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure"). Furthermore, as described above, the stop of Defendant's vehicle was not "legitimate." It so happens that the state of the law is less clear about whether a

---

[2] As previously discussed, the mere fact that the stop was pretextual is not the problem here. The illegality resides in stopping a car for a traffic violation when there was no probable cause that such a violation had been committed.

12

Defendant's identity can be suppressed after it is discovered as a result of unlawful police seizure, as occurred in this case.

The Supreme Court, in *Immigration and Naturalization Service v. López Mendoza*, held that "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 458 U.S. 1032, 1040 (1984). *López Mendoza* occurred in the immigration context for defendants accused of reentry of a removed alien in violation of 8 U.S.C.A. § 1326, and many subsequent court decisions addressing court's holding have also been in the immigration context.[3] Unfortunately, "the meaning of the *Lopez–Mendoza* 'identity statement' has bedeviled and divided" the circuit courts. *United States v. Oscar Torres*, 507 F.3d 224, 227 (4th Cir. 2007).

The Fourth, Ninth, and Tenth Circuits have interpreted the holding of *López Mendoza* to mean that that evidence showing a defendant's identity is indeed suppressible despite the Supreme Court's language that the "identity of a defendant . . . is never itself suppressible as a fruit of an unlawful arrest". *López Mendoza*, 458 U.S. at 1040 (1984). The Fourth Circuit, in *United States v. Oscar Torres*, concluded that *López Mendoza* "simply set forth the well-established bar on suppression of the body of the defendant and the fact of his identity, and did not extend that bar to *evidence* related to identity." 507 F.3d 224, 227 (4th Cir. 2007) (emphasis in original).

---

[3]Some courts have interpreted the strong wording of the Supreme Court in *López Mendoza* at face value. *See United States v. Bowley*, 435 F.3d 426, 430 (3rd Cir. 2006) ("Although we have not previously addressed this precise question, a number of other courts of appeals have addressed it, and each has refused to suppress a defendant's immigration file or identity in the context of a criminal prosecution for illegal reentry in violation of § 1326."); *United States v. Roque Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999) (Affirming the defendant's identity is not suppressible in a prosecution for violation of 8 U.S.C.A. § 1326); *United States v. Ortiz Hernández*, 427 F.3d at 577 ("We have . . . refused to suppress the defendant's identity in a 8 U.S.C. § 1326 prosecution even if it was "obtained as a result of an egregious constitutional violation.").

Likewise, the Tenth Circuit in *United States v. De La Cruz* and *United States v. Olivares–Rangel* held that "*Lopez–Mendoza,* however, does not exempt[ ] from the fruits doctrine all evidence that tends to show a defendant's identity" because "*Lopez–Mendoza's* statement that the body or identity of a defendant are never suppressible applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence." *United States v. De La Cruz*, 703 F.3d 1193, 1201 (10th Cir. 2013) (citing *Olivares Rangel*, 458 F.3d at 1111) (internal quotations omitted). In so holding, the Tenth Circuit read into *López Mendoza* a nuanced distinction between a Defendant's "body" and the admissibility of evidence of his identity, such as an identification document. *De La Cruz*, 703 F.3d at 1201. The court reasoned, "[h]ere, [the defendant] never argued that the district court lacked jurisdiction over him. Instead, he sought only to apply the normal and generally applicable Fourth Amendment exclusionary rule, . . . to suppress the identification card he gave the agents and the information the agents learned as a result of that identification card . . . . Therefore, the district court erred in concluding that [the defendant's] identification was not suppressible, even if there was an unlawful seizure." *Id.* (internal quotations omitted).

The Ninth Circuit in *United States v. Garcia Beltran* made a similar conclusion to the Tenth Circuit, explaining "[the defendant], however, did not seek to suppress the fact of his identity or 'body'; he recognized that he could lawfully be compelled to appear in court. Rather, he sought to exclude all evidence obtained from him as a result of his illegal arrest, including evidence that would tend to establish his true identity, such as fingerprints, photographs and oral statements . . . . *Lopez–Mendoza* does not preclude suppression of evidence unlawfully obtained from a suspect that may in a criminal investigation establish the identity of the suspect." 389

14

F.3d 864, 866–67 (9th Cir. 2004); *but see United States v. Ortiz Hernández*, 427 F.3d 567, 577 (9th Cir. 2005) ("[W]hen [the Supreme Court] said the body or identity of a defendant is never suppressible, it meant never.") (citing *United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004) (internal quotations omitted).

In contrast to the above courts' attempts to cabin the meaning of *López Mendoza*, other judicial forums have applied the holding from *López Mendoza* much more strictly. In *United States v. Sandoval Vásquez*, the U.S. District Court for the District of Massachusetts concluded that the Supreme Court meant "never" in *López Mendoza*, writing "[t]he division of authority . . . weighs heavily in favor of the proposition that when the court in *Lopez–Mendoza* said 'never,' it did not mean 'sometimes' or even 'hardly ever.'" 519 F. Supp. 2d 198, 200 (D. Mass. 2007). In *Navarro Chalan v. Ashcroft*, the First Circuit Court of Appeals similarly concluded that the defendant's "name is not information even subject to being suppressed. The identity of an alien, *or even of a defendant*, is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 359 F.3d 19, 22 (1st Cir. 2004) (emphasis added) (internal quotations omitted).

Additionally, at least one decision from the Court of Appeals for the First Circuit and one from the District of Massachusetts refused to suppress evidence of a defendant's identity even in cases outside of the immigration context. *United States v. Cruz Mercedes*, 945 F.3d 569, 576–77 (1st Cir. 2019) (Refusing to suppress identifying statements given in routine booking questions from a defendant charged in an identity fraud scheme because the statement was freely made and citing to *Navarro Chalan*, 359 F.3d at 22); *United States v. Eng*, 571 F. Supp. 2d 239, 250 n. 27 (D. Mass. 2008) (Noting in a narcotics prosecution case that "[w]hile the matter is not entirely free from doubt, this court is of the view that a person's identity is not protected by the Fourth

15

Amendment.") (citing *United States v. Olivares–Rangel*, 458 F.3d 1104, 1111 (10th Cir. 2006)); *see also United States v. Acuna*, 2008 WL 1836795, *9 (D. Ariz. Apr. 23, 2008) (Holding in a non-immigration case that "[t]he identity of a defendant is not suppressible as fruit of an unlawful arrest").

The Supreme Court's use of the word "never" in *López Mendoza* indicates that a defendant's identity or evidence tending to show that identity is not entitled to the same robust Fourth Amendment protections as other evidence. *See also Ortiz Hernández*, 427 F.3d at 577 ("We have reaffirmed that '[i]dentity evidence is inherently different from other kinds of evidence,' . . ."). Furthermore, taken to its logical conclusion, the Fourth, Ninth, and Tenth Circuit's attempts to limit the holding in *López Mendoza* are problematic. While it is theoretically easy to understand the difference between "identity" and "identity evidence," practically speaking, a defendant's identity is established using *evidence*—regardless of whether the case deals with an immigration violation or some other crime. Therefore, where a court determines that all evidence tending to show a defendant's identity must be suppressed, the court has, in effect, suppressed that defendant's identity in contravention of the Supreme Court's declaration that the "identity of a defendant . . . is never itself suppressible as a fruit of an unlawful arrest". *López Mendoza*, 458 U.S. at 1040 (1984). In that situation, the separation between "identity" and "identity evidence" converges and becomes a distinction without a difference. While such a scenario is not the case before the court,[4] this core inconsistency renders the interpretation used by the Fourth, Ninth, and Tenth circuits unpersuasive. Therefore, in accordance with the holding of *López Mendoza*, Defendant's identity and the evidence tending to

---

[4] In this case, in addition to Defendant's driver's license, law enforcement officers also made visual identifications of Defendant's body both at the airport and while he was driving his vehicle. Nothing about his visual observation violated Defendant's Fourth Amendment rights and could be used as evidence to identify him at least as the driver of the Mercedes Benz.

16

show his identity should not be subject to suppression even when discovered as a result of a Fourth Amendment violation. Thus, while Officer Feliciano would not have discovered Defendant's driver's license but for the unlawful traffic stop, Defendant's driver's license should not be suppressed as fruit of the poisonous tree.

## IV.     CONCLUSION

For the aforementioned reasons, Defendant's motion to suppress his own identity should be DENIED. Additionally, because Defendant has no standing to raise the Fourth Amendment rights of his passengers, his motion to suppress the evidence showing the identities of his passengers should also be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); see also 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 16th day of June, 2022.

s/Marcos E. López<br>
U.S. Magistrate Judge