IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>[1] MIGUEL ÁNGEL AGOSTO PACHECO,<br><br>Defendant. | CRIMINAL NO.: 18-82 (FAB) |

REPORT & RECOMMENDATION

## I.   PROCEDURAL HISTORY

Pending before the court is a motion to suppress by Miguel Ángel Agosto Pacheco ("Defendant"). ECF No. 350. On February 8, 2018 a grand jury returned an indictment against Defendant charging him with Conspiracy to Possess With Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii), and with Conspiracy to Import a Controlled Substance in violation of 21 U.S.C. §§ 963, 952, 960(a)(1), and 960(b)(1)(B). ECF No. 3 at 1–2. Defendant filed the instant motion to suppress in order to "suppress . . . items" of which he alleges the government "came into possession . . . illegally" during the course of Defendant's arrest on February 26, 2018.[1] ECF No. 350 at 1. Namely, Defendant focuses on suppressing the "contents" of a "black bag" which belonged to Defendant, and which allegedly contained "cellular phones." ECF No. 1, 4–5. The United States of America ("the Government") subsequently filed a response in opposition. ECF No. 351. In response to Defendant's motion to suppress, the government argues that any one of several warrant

---

[1] In his motion to suppress, the Defendant refers to his arrest on February 27, 2018. ECF No. 350 at 1. However, the evidence established at the evidentiary hearing before the court that the date of Defendant's arrest was actually February 26, 2018. ECF No. 531 at 77.

1

exceptions apply to this case, namely that the warrantless seizure and search of Defendant's black bag was lawful pursuant to the "search incident to arrest" exception under *Arizona v. Gant*, 556 U.S. 332, 338 (2009), the automobile exception, and the inventory search exception. ECF No. 351 at 13–17; ECF No. 537 at 5–7. An evidentiary hearing was held in which testimony and oral arguments from both parties were heard and documentary evidence submitted into the record. ECF Nos. 499, 500, 522. Both parties were also given an opportunity to file simultaneous post hearing briefs on May 16, 2022. ECF No. 537, 538.

## II.   FACTUAL BACKGROUND

On February 26, 2018, agents of the United States Marshals Service ("USMS") working as part of an Organized Crime and Drug Enforcement Task Force with the Drug Enforcement Administration ("DEA") executed an operation to locate, identify, and arrest Defendant. ECF No. 531 at 77, 79. Senior Inspector Felix Gabriel Carrión ("Senior Inspector Carrión"), who testified at the evidentiary hearing, was the team leader tasked with executing Defendant's arrest. ECF No. 531 at 72, 93. The USMS had a valid arrest warrant for Defendant based on drug trafficking charges issued on February 8, 2018. ECF No. 531 at 78, 98; ECF No. 5. Senior Inspector Carrión explained that by tracking a cell phone device, the USMS was able to locate Defendant in Urbanización Levittown Lakes, Toa Baja, Puerto Rico. ECF No. 531 at 79, 128. The arrest team consisted of six or seven federal law enforcement agents traveling in three vehicles. ECF No. 531 at 80. As the arrest team entered Urbanización Levittown Lakes, Defendant was spotted traveling in the front passenger seat of a four-door sedan, accompanied by a driver. ECF No. 531 at 80–81. Upon identifying the Defendant, the arrest team used their vehicles to block the path of the four-door sedan in which Defendant was traveling. ECF No. 531 at 81. The arrest team ordered Defendant to step out of his vehicle and Defendant complied. ECF

No. 531 at 83. While Senior Inspector Carrión provided cover, Special Deputy U.S. Marshals Heriberto Rivera ("Special Deputy Rivera") and Miguel Colón Escalante ("Special Deputy Colón") left their vehicles, approached Defendant on the passenger side of the four-door sedan, and then brought Defendant to the rear of the sedan. ECF No. 531 at 83–84.

Defendant was subjected to a pat-down search by the federal agents and no weapons, drugs, or other illegal objects were found on his person. ECF No. 531 at 102–03. At that point, Senior Inspector Carrión joined the Deputy Marshals and the Defendant at the rear of the sedan and requested that Defendant provide them proof of identification ("ID"). ECF No. 531 at 84. Defendant replied that his ID was "in the front passenger side" of the sedan. ECF No. 531 at 85. Special Deputy Marshals Rivera and Colón escorted Defendant back to the front passenger seat of the sedan while Senior Inspector Carrión observed. ECF No. 531 at 86. Senior Inspector Carrión testified that he saw Defendant grab a black "sling bag" from the front passenger seat of the vehicle. ECF No. 531 at 87. As Defendant opened the black bag and retrieved his wallet, Senior Inspector Carrión testified that he was watching Defendant's hands and clearly saw Defendant's wallet and twenty-dollar bills inside the black bag. ECF No. 531 at 108. The Government introduced into evidence at the hearing a photo of a black bag, admitted as Exhibit 4, which Senior Inspector Carrión identified as the bag which Defendant grabbed in the front passenger seat. ECF No. 500–4. After opening the black bag, Senior Inspector Carrión explained that Defendant "just retrieved the wallet and then he came back . . . to the trunk of the vehicle . . . ." ECF No. 531 at 87.

After Defendant extracted his wallet from the black bag, he showed the agents his ID from his wallet, after which Defendant was informed that he was being placed under arrest and was put in handcuffs. ECF No. 531 at 88, 103. From there, Defendant was placed in a law

enforcement vehicle and transported to the DEA. ECF No. 531 at 89. At the same time that the USMS had been interacting with the Defendant, other federal agents also detained the driver of the sedan, patted him down, and ran a check on him for any outstanding warrants. ECF No. 531 at 89–90. Before the driver was allowed to return to the vehicle, Senior Inspector Carrión testified that the federal agents conducted what he described as a "plain view" search of the vehicle to ensure there was nothing dangerous. ECF No. 531 at 90–91. Once the federal agents were confident that the driver of the sedan had no outstanding arrest warrants and once Defendant had been handcuffed, the driver of the sedan was released and he left the scene. ECF No. 531 at 102, 104. Senior Inspector Carrión testified unequivocally that the driver of the black sedan was not stopped again after he was released. ECF No. 531 at 127.[2]

Upon arriving to a "DEA location" with Defendant, Senior Inspector Carrión once again observed the black bag as DEA agents were conducting an inventory of the contents of the bag. ECF No. 531 at 91, 110. Senior Inspector Carrión did not know who had seized the black bag but testified that he had not seized the bag himself. ECF No. 531 at 109–10. Senior Inspector Carrión also did not know whether anything else besides Defendant's person and the black bag were retrieved from the sedan during Defendant's arrest. ECF No. 531 at 113. Senior Inspector Carrión communicated that more items than are visible in the photo of the black bag in Exhibit 4 were inside the bag. ECF No. 531 at 113. However, at no point was evidence delineating the full contents of the black bag presented to the court.

---

[2] Even though Defendant argues in his motion to suppress that the black bag was seized after the driver was allowed to leave in the sedan with the bag and that the agents intervened a second time, (ECF No. 350 at 4) no evidence at the hearing was presented to such effect and Senior Inspector Carrión's testimony clearly contradicts such a course of events. When asked whether there was a second stop after the driver was allowed to leave, Senior Inspector Carrión responded "Absolutely not." ECF No. 531 at 127.

### III. LEGAL ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). In analyzing reasonableness, a search which is "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. at 338 (citing *Katz v. United States,* 389 U.S. 347, 357 (1967)). The search of an automobile is subject to Fourth Amendment protections, even though "the expectation of privacy in an automobile is not as great as that in a home." *Preston v. United States*, 376 U.S. 364, 366–67 (1964). While the Defendant bears the burden of showing a Fourth Amendment violation, when a warrantless search was executed by law enforcement, then "[t]he government bears the burden of proving the lawfulness of the search." *United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *United States v. López*, 380 F.3d 538, 543 (1st Cir. 2004). Accordingly, it is the government's burden to show an exception to the warrant requirement in the event of a warrantless search. *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

### A. Searches Incident to Arrest

First, the Government argues that the warrantless seizure of Defendant's black bag was lawful incident to Defendant's arrest, citing *Gant*, 556 U.S. at 335. Defendant "concedes that the [doctrine under *New York v. Belton*, 453 U.S. 454 (1981) and *Chimel v. California*, 395 U.S. 752 (1969)] may justify the seizure of the defendant's wallet, jewelry, and black bag and its contents, as described above and in the testimony and as visible in Exhibit 4." ECF No. 538 at 10 (citing ECF No. 500-4). Before 2009 and under *Belton*, the Supreme Court had applied *Chimel*'s search-incident-to-arrest exception to the vehicle context and allowed law enforcement officers to

"conduct a warrantless search of "the passenger compartment of [the arrestee's] automobile". *Gant*, 556 U.S. at 335. "For years, *Belton* was widely understood to have set down a simple, bright-line rule. Numerous courts read the decision to authorize automobile searches incident to arrests of recent occupants, regardless of whether the arrestee in any particular case was within reaching distance of the vehicle at the time of the search." *Davis*, 564 U.S. at 233. "Even after the arrestee had stepped out of the vehicle and had been subdued by police, the prevailing understanding was that *Belton* still authorized a substantially contemporaneous search of the automobile's passenger compartment." *Id*. However, in *Gant*, the Court "clarified that an automobile search may fall within the search-incident-to-arrest doctrine only in two very specific situations: [1] when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search (the officer-safety justification), or [2] when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle (the evidence-preservation justification)." *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011) (citing *Gant*, 556 U.S. at 335) (internal quotations omitted).[3]

### 1.    The Officer Safety Justification

As mentioned above, the first prong under *Gant*'s search-incident-to-arrest exception involving automobiles allows for a search to protect officer safety, where the Defendant is

---

[3] *Gant* did not alter the widely recognized "automobile exception to the warrant requirement." *Polanco*, 634 F.3d at 42 ("*Gant* did not scrap [the automobile exception] . . . That is not just our opinion: every circuit that has considered the issue to date has either concluded or assumed that the auto exception survived under *Gant*."). As succinctly explained by the First Circuit in *United States v. Polanco*,
> The auto exception is distinct from the evidence-preservation component of *Gant*'s search-incident-to-arrest analysis (which for simplicity's sake we call the *Gant* evidentiary justification). We give two examples only. The auto exception extends beyond the crime of arrest. . . . But the *Gant* evidentiary justification does not extend to evidence of other offenses. . . . Also, the auto exception requires probable cause. . . . But the *Gant* evidentiary justification only requires a "reasonable basis." . . . These distinctions make a difference. And, for obvious reasons, it is important to keep them straight.

*Id*. at 42–43 (internal citations omitted). Because the search incident to arrest exception applies in this case, which provides a lower standard of suspicion and a more limited scope for a lawful search than that permitted under the automobile exception, there is no need to discuss the automobile exception here.

"unsecured and within reaching distance of the passenger compartment at the time of the search . . . ." *Gant*, 556 U.S. at 351. In making a finding as to whether the officer safety prong of *Gant* justified the search, courts consider factors such as how close the Defendant was to the passenger compartment and whether the Defendant had been patted down, placed in a law enforcement vehicle, handcuffed, or was "outnumbered by law enforcement officers." *See e.g. United States v. Vicente Lucas*, 826 F. Supp. 2d 422, 429 (D.P.R. 2011) ("Although it is true that [defendants] were handcuffed at the time [the police] recovered the second firearm from their vehicle, they were nonetheless standing in close proximity to it (about two or three feet) and thus were arguably within reaching distance of the passenger compartment. The defendants still had not been placed inside the patrol car, had not been patted down, and were not outnumbered by the police officers."). In this case, however, the government has failed to show any evidence that would put the court in a position to determine that the initial search of defendant's black bag occurred at the scene of the arrest or any other facts which would justify such a search under the officer safety justification. No evidence was presented at the hearing to show if, when, where, or how Defendant's black bag was searched at the time of Defendant's arrest, as explained below.

Senior Inspector Carrión testified that when he asked Defendant to produce his ID, Defendant was standing several feet away from the black bag in the front passenger seat while he was being custodied at the rear of the sedan by at least three agents of the USMS—Senior Inspector Carrión, Special Deputy Marshal Rivera, and Special Deputy Marshal Colón. ECF No. 531 at 83–84. At that time, although outnumbered by the federal agents, the Defendant was not in handcuffs. ECF No. 531 at 88, 103. In compliance with Senior Inspector Carrión's instructions, Defendant returned to the front seat to retrieve his wallet and ID from the black bag. ECF No. 531 at 84–85. The USMS did not search Defendant's black bag before Defendant was

allowed access to it because Senior Inspector Carrión testified that he watched Defendant open the bag himself and retrieve his wallet with his ID from the bag. ECF No. 531 at 108. Senior Inspector Carrión explained that they allowed Defendant to reach into his bag because Defendant "was being compliant," although Senior Inspector Carrión emphasized that he was watching Defendant's "hands" as Defendant opened the bag to ensure that he did not reach for something dangerous. ECF No. 531 at 86, 110. Thus, the Deputy Marshals were concerned enough about their safety to watch Defendant closely as he opened and reached into the bag himself, but they were not concerned to such a degree that they opened the bag and searched it themselves before Defendant was given access.

More importantly, while it is clear that the bag was not searched before Defendant accessed the bag, Senior Inspector Carrión did not clarify whether at the scene of the intervention the bag was either seized or searched after the Defendant extracted the wallet. He only testified that Defendant "grabbed a black bag, you know, kind of like a sling bag and then he just retrieved a wallet and then he came back to the back of the vehicle." ECF No. 531 at 87. The Government's attorney followed up on this line of questioning with the following exchange:

> Q: He [Defendant] retrieved as you state a black bag.
> A: Yeah, I have a side view of the whole thing, correct.
> Q: From there he [Defendant] retrieved the wallet.
> A: Yes, he did.
> Q: Okay and after he [Defendant] produced the wallet, what happened next?
> A: He [Defendant] [was] escorted back to me because I'm the one that asked him to show me his Id.
> Q: Okay, I'm showing you what's been marked as Government Exhibit number 5.
> A: Yes.
> Q: Do you recognize what's depicted?
> A: Yes, I do recognize that. That was after he [Defendant] showed me the Id, right, and everything was under control. . . . After that was done, I instructed my Task Force Officers to place him [Defendant] under arrest . . . and transfer him over to the DEA.

ECF No. 531 at 87–88.

While Senior Inspector Carrión frequently mentions the wallet and the ID, he does not mention the black bag again after describing how Defendant withdrew his wallet from the bag. Senior Inspector Carrión's testimony also does not indicate whether Defendant left the bag in the front passenger seat or brought the bag with him to the back of the sedan when he showed the agents his ID. In Exhibit 5, a photo depicting the moment Defendant was handcuffed, the Defendant is not wearing or holding the black bag, nor is it visible in the picture. ECF No. 500-5. When Defense counsel asked Senior Inspector Carrión "On that day you seized this bag which was the bag that Mr. Agosto use [sic] . . . to get the wallet[?]", Senior Inspector Carrión responded, "Yes, sir." ECF No. 531 at 108. However, Senior Inspector Carrión later clarified that he himself did not take custody of the black bag, and he did not see who did. ECF No. 531 at 109–10. Senior Inspector Carrión only saw the bag when Defendant took his wallet out of the bag and again when the inventory search of the bag was done at the "DEA location." ECF No. 531 at 110. Senior Inspector Carrión also testified that he was not aware if anything else was seized during Defendant's arrest in addition to Defendant himself and the black bag. ECF No. 531 at 113–14.

Based on this testimony and the circumstantial evidence, a reasonable inference can be drawn that at some point the bag was seized by law enforcement at the scene of Defendant's arrest. However, Senior Inspector Carrión's testimony did not establish if, when, or where the bag was searched at the scene of Defendant's arrest before its arrival at the "DEA location." His testimony did not explain whether the bag was searched in the front passenger seat after Defendant opened it to extract his wallet, or whether Defendant brought the bag to the back of the sedan where it was subsequently searched. His testimony also does not indicate whether the bag was searched or seized before or after the Defendant was handcuffed. Senior Inspector

Carrión only testified that he did not seize or search the bag, and he did not see anyone else seize or search it either at the scene of Defendant's arrest. The evidence before the court merely shows that there was a black bag in the front passenger seat of the sedan where Defendant had been traveling, Defendant opened the bag to extract his wallet, and then later that day federal law enforcement agent had taken the bag to the DEA location. Where that bag was located in the interim and whether it was searched before arriving at the DEA location is unclear.

This evidence does not place the court in any position to determine whether the officer-safety justification under *Gant* is applicable to the black bag in this case. Because there is no evidence regarding the time or place of the search, if any, before the inventory search at the DEA location, it is therefore impossible to determine whether Defendant was "within reaching distance" of the black bag in the front passenger seat area so as to pose a threat to the safety of the officers and justify a search at the scene. *Davis*, 564 U.S. at 234–35 (2011) (citing *Gant*, 556 U.S. at 351).[4] Accordingly, the Government has failed in its burden to show that the warrantless search of the bag was justified by the officer-safety rationale in a search incident to arrest under *Gant*.[5]

2.     **The Evidentiary Preservation Justification**

Despite the insufficiency or lack of evidence to support the officer-safety rationale, Senior Inspector Carrión's testimony did establish that the USMS agents had a reasonable belief that the sedan and the black bag contained "evidence relevant to the crime of arrest"—in this case drug trafficking—which justified seizing the black bag under the "evidentiary preservation

---

[4] It is unknown, for example, if the black bag was seized and searched in one of the two occasions when the Defendant was behind the trunk of the car, and thus far from the black bag.

[5] Furthermore, as discussed further below, the fact that the officers allowed the Defendant to open the bag himself and pull items out provides some indication that the USMS agents were not gravely concerned for their safety as it related to the bag or items contained therein.

component of *Gant.*" *Davis*, 564 U.S. at 234–35; *Vicente Lucas*, 826 F. Supp. 2d at 430. As mentioned above, when making a search incident to arrest of a vehicle, law enforcement "officers need only a reasonable basis to carry out a search under the evidentiary preservation component of *Gant.*" *Vicente Lucas*, 826 F. Supp. 2d at 430 (citing *Polanco,* 634 F.3d at 43). For example, in *United States v. Mensah* police officers investigating the defendant believed that he "had obtained driver's licenses under two different names, one of which was false." 737 F.3d 789, 795 (1st Cir. 2013). The officers therefore obtained "a valid arrest warrant charging [the defendant] with unlawfully obtaining a driver's license under a false name." *Id.* The officers executed the warrant by stopping the defendant in his vehicle, and subsequently searched the vehicle. *Id.* The First Circuit examined whether the officers' search of defendant's vehicle was lawful under the evidentiary preservation section of *Gant*, analyzing whether the officers "could have reasonably believed" that the false driver's license or any other documents showing he had obtained the false license would be in the defendant's vehicle. *Id.* The court concluded that it was "reasonable for the officers to believe that he would have both licenses readily available in his vehicle" because "the passenger compartment of a car is by custom and necessity[ ] a common repository for motor vehicle-related documents. Given that the officers knew that [the defendant] was using licenses in two different names, it would be reasonable for them to presume that he had obtained multiple licenses so that he could represent himself as a different person at his convenience." *Id.* (internal quotations omitted).

Like in *Mensah*, in this case an arrest warrant had already been issued for Defendant on the day of his arrest, and there is therefore no doubt as to the existence of probable cause for his arrest. Additionally, Senior Inspector Carrión testified that he and the other members of the task force participated in a pre-arrest briefing during which the law enforcement officers were given

11

information identifying Defendant as the target of the arrest operation. ECF No. 531 at 94–97. During the briefing, Senior Inspector Carrión described how the task force members were also informed of the existence of an arrest warrant for Defendant and were told that Defendant was being arrested on charges of organized crime and drug trafficking. ECF No. 531 at 97–98. Senior Inspector Carrión also explained that as part of arresting a suspect, the USMS is tasked with securing a suspect's "property, anything that's related to him . . . in order for us to provide it to that lead [law enforcement] agency." ECF No. 531 at 74. He testified that the USMS agents were to collect anything "within the search incident area" including "the body [of the suspect] and whatever is around the body." ECF No. 531 at 99.

Based on the above information that the task force members knew at the time of the arrest, it was reasonable for them to seize the black bag because the USMS agents identified the bag inside the vehicle as belonging to Defendant, and because the black bag could have reasonably contained evidence of drug trafficking—the offense of Defendant's arrest. Because the task force members knew that Defendant was being arrested for drug trafficking, like the officers in *Mensah* it was reasonable for them to believe that the vehicle in which Defendant was traveling could contain evidence of drug trafficking. Furthermore, the USMS agents quickly identified the black bag as Defendant's property. Defendant communicated to Senior Inspector Carrión that his ID was in the front passenger seat and when escorted to the front seat, Defendant took his ID and wallet out of the black bag. ECF No. 531 at 85. It was reasonable for the deputy Marshals to conclude that the black bag belonged to Defendant and was in his control because it contained both his wallet and his ID. After making this identification it was reasonable for the USMS agents to conclude that Defendant's black bag could contain evidence of the offense for which Defendant was being arrested—namely drug trafficking. The black bag was also of the

size and shape that it could reasonably contain evidence of drug trafficking, such as drugs, cellphones, drug ledgers, or significant quantities of cash and is "a common repository" for such items. *Mensah*, 737 F.3d at 795. In sum, because the task force members knew beforehand that Defendant was being arrested for drug trafficking, as soon as the USMS agents identified the black bag inside the vehicle as belonging to defendant, and because the black bag could have reasonably contained evidence of the offense of Defendant's arrest, the seizure of the bag was reasonable under the evidentiary preservation justification in *Gant*.

### B. Inventory Searches & The Inevitable Discovery Rule

Even so, Defendant argues that what was found inside Defendant's black bag must be suppressed because the task force members "did not seek a warrant to search the contents of the black bag which was seized [from] the car." ECF No. 350 at 4. The government responds that the discovery of the contents of the black bag are subject to the inevitable discovery exception to the warrant requirement because the contents would have inevitably been discovered in an inventory search of the bag following Defendant's arrest. ECF No. 537 at 7. Defendant responds that an inventory search is not applicable because "there was no inventory search as the vehicle itself was not seized." ECF No. 538 at 10. Here, the Government has the better of the two arguments.

An inventory search is not limited to the seizure and subsequent inventory of the contents of vehicles; an inventory search may also be conducted of personal items seized with the arrestee. In *Illinois v. Lafayette* the Supreme Court wrote that "it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." 462 U.S. 640, 646 (1983). In that case, the Court explained that when making a list or inventory of Defendant's belongings "[i]t is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises

independent of a particular officer's subjective concerns." *Id.* at 649. Finally, the Court stated: "[W]e hold that it is not "unreasonable" for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id.*

Moreover, the Court of Appeals for the First Circuit has openly applied the inevitable discovery warrant exception to inventory searches of an arrestee's personal belongings. *United States v. Pardue*, 385 F.3d 101, 105–06 (1st Cir. 2004); *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) ("[B]y like token, courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule . . . ."). In *United States v. Pardue* law enforcement officers seized the defendant's backpack before arresting the defendant for domestic assault. *Id.* at 104–06. The the defendant moved to suppress ammunition which the police officers found when they searched inside defendant's bag at the scene of defendant's arrest. *Id*. at 104. The First Circuit concluded that the search of Defendant's bag exceeded the "bounds set by *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]" because the bag had been taken away from the defendant and there was no risk that the defendant could have "obtained a weapon or anything else from it." *Id*. at 105. Nevertheless, the court in *Pardue* declined to overturn the district court's decision denying suppression the evidence inside the bag. *Id.* at 107. The First Circuit Court of Appeals explained that it uses a "a three-part test for applying the inevitable discovery exception":

> first, whether the legal means [are] truly independent; second, whether both the use of the legal means and the discovery by that means are truly inevitable; and, third, whether the application of the inevitable discovery exception either provides an incentive for police misconduct or significantly weakens fourth amendment protection.

*Id.* at 106 (citing *United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001)).

In applying the test, the Court of Appeals for the First Circuit upheld the district court's finding "that the government had met its burden of showing the legal means were truly independent, since the evidence put forth in the suppression hearing established that both the jail and the Portland Police Department had policies that would have led to a search of the backpack." *Pardue*, 385 F.3d at 106. In that case, the testimony of a Portland police officer who conducted an inventory search as well as the testimony of a staff sergeant at the county jail established that, independently of whether the bag had been searched by the other, it was "routine practice to confiscate contraband such as ammunition . . . . Thus, the ammunition would have been discovered in the backpack by way of a routine search of personal belongings." *Id.* at 107 (citing *Lafayette*, 462 U.S. at 645). Therefore, the First Circuit Court of Appeals likewise concluded that the defendant's "backpack would inevitably have been opened by either the Portland Police Department or the Cumberland County Jail staff sergeant and the ammunition would have been discovered." *Pardue*, 385 F.3d at 108. Finally, the court determined that "any Fourth Amendment violation was unintentional" and that the application of the inevitable discovery rule on the facts of that case did not "create an incentive for future police misconduct. *Id*.

There is no reason to deviate from the holdings in *Lafayette* and *Pardue* based on the facts of this case. Here, the legal means to open the bag and inventory its contents at the DEA location were independent from the legal justification for searching or seizing the black bag at the time of Defendant's arrest. As discussed above, the USMS seized Defendant's bag at the time of his arrest pursuant to the search incident to arrest exception under *Gant*. Once the bag was lawfully in law enforcement's possession, Senior Inspector Carrión witnessed agents at the DEA location open the bag and conduct an inventory search. ECF No. 531 at 91, 110. Senior

Inspector Carrión testified that an inventory search is "protocol for . . . these type of cases" to determine "basically all the belongings that the [arrestee] at the time had." ECF No. 531 at 91. Therefore, the search of the contents of the bag was both independent and inevitable pursuant to the federal agents' established procedure during the arrest of high value targets suspected of drug trafficking. Furthermore, in this case, unlike in *Pardue*, there was no Fourth Amendment violation which occurred when law enforcement agents seized Defendant's black bag. Therefore, the subsequent inventory search does not create nor implicate any incentive for police misconduct nor does the application of the inevitable discovery rule in this case weaken Fourth Amendment protections in any way. In sum, the inevitable discovery exception to the warrant requirement permitted law enforcement agents to open and search Defendant's black bag pursuant to an inventory search and without securing a search warrant. Therefore, Defendant's motion to suppress on the basis that law enforcement lacked a warrant to search the contents of his bag should be denied.

### IV.  CONCLUSION

In conclusion, the Defendant moves to suppress "fruits of the illegal searches" on February 26, 2018, arguing that law enforcement did not possess a search warrant to search the sedan in which he had been traveling or to search the "contents of the black bag which was seized from the car . . . ." ECF No. 350 at 3. In his original motion to suppress, Defendant specifically stated that "[t]he black bag allegedly contained several items, including several cell phones . . . ." ECF No. 350 at 3. At the evidentiary hearing held on March 25, 2022, the court held a sidebar with the parties, during which the parties were offered an opportunity to stipulate to the contents of the black bag, including the cell phones. ECF No. 531 at 116–123. During that sidebar the Government stated "Your Honor, I understand that the value of the suppression

hearing is basically this, the phones. We can stipulate the phones . . ." and "I think the easiest way to do it is to say 'the only things you [Defendant] care about are the phones. We stipulate with you [Defendant] that the phones go away if the bag is suppressed.'" ECF No. 531 at 119, 122. However, the Defendant ultimately refused to stipulate to any specific contents of the bag which he nevertheless seeks to suppress, stating on the record "Oh, I dispute. I don't agree that they were inside the bag. That should be clear. That's the government's position." ECF No. 531 at 125.

Now, in his post-hearing brief, Defendant requests the court suppress "**the five cell phones whose seizure is the very and only purpose of the suppression motion**" and argues "the only items that search incident to arrest yielded were [Defendant's] wallet and jewelry, along with the black bag and items pictured within it in Exhibit 4." ECF No. 538 at 9. (emphasis in original). Defendant thus argues that "any items beyond those previously referenced would have been obtained pursuant to other undisclosed and unsupported searches or seizures presumptively conducted on the vehicle at the scene which were not described or justified. Specifically, the seizure of the five cell phones—which are the very purpose of the suppression motion—was not explained or justified." ECF No. 538 at 9 (emphasis in original). As such, Defendant has now made clear that he seeks to suppress five cell phones which were found during Defendant's arrest but does not specify his position as to where those phones were located at the time of the intervention.

Senior Inspector Carrión testified at the suppression hearing that he was able to see a wallet and cash in the black bag. ECF No. 531 at 108. Regarding any other contents inside the black bag, no testimonial evidence was presented. Senior Inspector Carrión also did not know whether anything aside from the Defendant and the black bag was seized from the sedan. ECF

No. 531 at 114. Although the parties attempted to stipulate the contents of the black bag, said effort proved to be fruitless. Despite the parties' failure to reach a stipulation as to the contents of the black bag, the Government chose not to call any witness at the suppression hearing with knowledge as to who seized the black bag, when exactly it was seized, and what exactly was found in the bag, if anything, in addition to the wallet and the cash. However, at no point did Defendant allege facts, nor was evidence produced at the hearing, showing that another search or seizure which produced cell phones was conducted in addition to the plain-view search of the vehicle and the seizures of Defendant's person and Defendant's black bag. United States v. Lewis, 40 F.3d 1325 (1st Cir. 1994) ("The defendant must allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.") (internal citations omitted). In sum, no evidence at all was introduced—by the Government or Defendant—at the suppression hearing regarding the alleged cell phones in controversy. Thus, this report and recommendation limits itself to whatever was contained in the black bag, as the Defendant never alleged with specificity any items found in the vehicle aside from the black bag and the Government never called any witness that could testify about any items seized aside from the black bag, the wallet and cash in the bag, and any jewelry on Defendant's person.

      Regardless, if the phones were in the black bag, the phones and the resulting extractions should not be suppressed as the bag and its contents were lawfully seized. If, however, the phones were in the vehicle, but not in the black bag, then the evidence preservation justification of the search-incident-to-arrest exception to the warrant requirement dictates that they should not be suppressed. Furthermore, if the phones were found on Defendant's person, they were items seized alongside his person, like his hat and jewelry, and subject to search at the DEA location

through an inventory search under the inevitable discovery exception to the warrant requirement. Finally, if the phones were on the person or the actual possession of the driver of the vehicle when they were seized, Defendant has not made a showing that he has standing to seek suppression of said phones. United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993) ("[A] defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have "standing" to claim that an illegal search or seizure occurred.").

For the foregoing reasons, Defendant's motion to suppress (ECF No. 350) should be DENIED. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); see also 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 9th day of July, 2022.

s/Marcos E. López  
U.S. Magistrate Judge
